UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

JOANNA P. LESTER, ET AL.                  CIVIL ACTION NO. 05-0671

VERSUS                                    JUDGE S. MAURICE HICKS, JR.

SECRETARY OF VETERANS AFFAIRS             MAGISTRATE JUDGE HORNSBY

MEMORANDUM RULING

Before the Court is a Motion for Summary Judgment (Record Document 11) filed by Defendant, the Secretary of Veterans Affairs ("Defendant").  Plaintiffs Joanna Lester and Darien Lester ("Plaintiffs") oppose the Motion for Summary Judgment.  See Record Documents 13 & 15.  For the reasons assigned herein, the Motion for Summary Judgment is **GRANTED**.

I.      **FACTUAL AND PROCEDURAL BACKGROUND.**[1]

Ms. Lester was hired by the Department of Veterans Affairs on December 13, 1999 as a Medical Instrument Technician.  She continues to work in that capacity at the Radiology Service at Overton Brooks Medical Center in Shreveport, Louisiana.  She was promoted from a GS-6 during her tenure at the medical facility and now holds rank at the GS-8 level.  Her first line supervisor at the time of the events surrounding the instant lawsuit was Christopher Moore ("Moore").

Three technicians worked in the Ultrasound Department at Overton Brooks Medical Center at the times relevant to this case: Ms. Lester (an African-American female), Ms.

_____

[1]The Court has essentially adopted the Factual Background stated in Defendant's Motion for Summary Judgment, as Plaintiffs stated in their opposition brief that "[t]he Defendant's Factual Background appearing in the Motion is currently correct."  Record Document 15 at 1.

Ross (an African-American female), and Ms. Nordan (a Caucasian female).  Ms. Lester and Ms. Ross share the same position description (#04307A), while Ms. Nordan has a position description (#052000) which does not require her to hold a radiologic technologist's license.  See Record Document 11, Exhibit 1 at 297-298, 380-387.

Ms. Lester's position description states that she was employed in the Ultrasound Department approximately 75% of the time and in General Radiology approximately 25% of the time.  See id., Exhibit 1 at 382.  The position description for both Ms. Lester and Ms. Ross requires an American Registry of Radiologic Technologists license, which enables them to perform x-ray procedures unassisted.  See id., Exhibit 1 at 297-298.  Ms. Nordan's position description does not require that license.  See id.  Therefore, she cannot perform x-ray procedures unassisted and she can not work in the Radiology Department without the appropriate licensure.  See id.  That restriction eliminated her from the list of personnel who were able to cover certain on-call scheduling needs.  See id.  She did, however, assist others with x-ray procedures.[2]

_____

[2]Ms. Lester alleges that position description #04307A, as contained in defense exhibits (Record Document 11, Exhibit 1 at 382), was not in place at the time she, Ms. Ross, and Ms. Nordan were hired in the Ultrasound Department.  See Record Document 15-1 at 1.  Rather, Ms. Lester alleges that the position description in effect when she first initiated her charges of discrimination required no general radiology duties and that Defendant changed position description #04307A "to try to appear to be nondiscriminatory."  Record Document 13-3 at ¶ 2.  Ms. Lester also alleges throughout her opposition to the Motion for Summary Judgment that Ms. Nordan should not have been hired because she did not have AART certification to perform certain x-ray duties.  See Record Document 15-1 at 2.

Even if this Court assumes that Ms. Lester's contention regarding position description #04307A is accurate, such discrepancy does not affect the outcome of this case.  As set forth in the instant Memorandum Ruling, Ms. Lester's discrimination claims alleging that Ms. Nordan, a white female, received preferential treatment fail because Ms. Nordan was not a similarly situated comparator for purposes of Title VII.  Likewise, the record is clear that Ms. Lester is not making a failure to hire claim under Title VII, thus her

Ms. Lester alleges that on March 30, 2004, she was placed on the emergency call-back roster to perform general diagnostic work. <u>See</u> Record Document 1, ¶ 2. Ms. Lester contends that this act was discriminatory because her white co-worker, Ms. Nordan, had never been placed on the emergency call-back roster for general diagnostic work. <u>See id.</u> Ms. Lester further alleges the following discriminatory acts: (1) from April 7, 2003 to May 10, 2003, she was forced to perform double duty in surgery and portables in the x-ray department; (2) on May 31, 2003, July 4, 2003, and on September 5, 2003, she was unfairly scheduled to work on holidays; (3) on June 24, 2003, her income was decreased because job duties that she had been performing for three and one-half years were taken away without reason or justification; (4) from July 5, 2003 to July 17, 2003, she was unfairly placed on the emergency coverage roster while her co-worker, Ms. Nordan, was never placed on such roster; (5) on July 6, 2003, she was scheduled to work although her supervisor knew in advance that she was going on a trip with the Girl Scouts; (6) on August 8, 2003, her supervisors scheduled her to be on call although he knew months earlier that she had requested vacation from August 4-8, 2003; and (7) in March 2004, she was denied an opportunity to cross-train while a co-worker was given such opportunity. <u>See id.</u>, ¶ 3.

On August 11, 2003, Ms. Lester filed a formal EEO complaint regarding her claims of discrimination based on race, religion, and sex. <u>See</u> Record Document 11, Exhibit 1 at 1. Ms. Lester filed a second EEO complaint on May 12, 2004, but such complaint was dismissed as duplicative on January 13, 2005. <u>See id.</u>, Exhibit 2. On December 9, 2004, an Administrative Judge granted summary judgment in favor of the United States

---

allegation that Ms. Nordan should not have been hired because she did not have AART certification is simply not relevant to the instant case.

Department of Veterans Affairs, finding no discrimination based on race, sex, or religion in connection with miscellaneous working conditions, including duty assignments, scheduling, and training opportunities. See id., Exhibits 3 & 4. On January 14, 2005, Ms. Lester received a Final Agency Decision adopting the ruling of the Administrative Judge as to her discrimination claims. See id., Exhibit 4.

On April 14, 2005, Plaintiffs filed a complaint in this Court naming the Secretary of Veterans Affairs as Defendant. See id. Ms. Lester alleged discrimination based on race, sex, and religion along with intentional infliction of emotional distress and negligent infliction of emotional distress. See id., ¶ 4. Mr. Lester alleged loss of consortium, loss of love and affection, intentional infliction of emotional distress and negligent infliction of emotional distress. See id., ¶ 7. Defendant answered on June 24, 2005, denying both the factual allegations of the complaint and alleging affirmative defenses. See Record Document 3. Defendant filed the instant Motion for Summary Judgment on October 27, 2006, seeking dismissal of all of Plaintiffs' claims. See Record Document 11. The Clerk of Court issued a Notice of Motion Setting on October 30, 2006, directing that any briefs in opposition to Defendant's Motion for Summary Judgment "are due within 15 calendar days from the date of this notice." Record Document 12. Plaintiffs filed an opposition brief on November 22, 2006. See Record Document 13. Such brief was deemed deficient by the Clerk of Court and Plaintiffs filed a corrective opposition brief on December 6, 2006. See Record Documents 14 & 15.

The Court further notes that Plaintiffs' November 22, 2006 opposition brief was untimely. By the Court's calculation based on the Notice of Motion Setting, such brief was due no later than November 14, 2006. Yet, Defendant has made no objection as to the

timeliness of the opposition brief and this Court, within its discretion, will consider Plaintiffs'

opposition brief in ruling on the instant Motion for Summary Judgment.

## II.    LAW AND ANALYSIS.

### A.    Summary Judgment Standard.

Summary judgment should be granted if the record, taken as a whole, "together with

the affidavits, if any, show that there is no genuine issue as to any material fact and that

the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c);  New

York Life Ins. Co. v. Travelers Ins. Co., 92 F.3d 336, 338 (5th Cir. 1996).  The Supreme

Court has interpreted the plain language of Rule 56(c) to mandate "the entry of summary

judgment, after adequate time for discovery and upon motion, against a party who fails to

make a showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v.

Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); see also Gunaca v. Texas, 65

F.3d 467, 469 (5th Cir. 1995).  A party moving for summary judgment "must 'demonstrate

the absence of a genuine issue of material fact,' but need not negate the elements of the

nonmovant's case." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)

(quoting Celotex, 477 U.S. at 323-25, 106 S. Ct. at 2552).  If the moving party "fails to meet

this initial burden, the motion must be denied, regardless of the nonmovant's response."

Little, 37 F.3d at 1075.

If the moving party meets this burden, Rule 56(c) requires the nonmovant to go

beyond the pleadings and show by affidavits, depositions, answers to interrogatories,

admissions on file, or other admissible evidence that specific facts exist over which there

is a genuine issue for trial.  Wallace v. Texas Tech Univ., 80 F.3d 1042, 1046-47 (5th Cir. 1996).  The nonmovant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence.  Little, 37 F.3d at 1075; Wallace, 80 F.3d at 1047.  Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts."  Wallace, 80 F.3d at 1048 (quoting Little, 37 F.3d at 1075); see also S.W.S. Erectors, Inc. v. Infax, Inc., 72 F.3d 489, 494 (5th Cir. 1996). The Court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts."  McCallum Highlands v. Washington Capital Dus, Inc., 66 F.3d 89, 92 (5th Cir. 1995), as revised on denial of rehearing, 70 F.3d 26 (5th Cir. 1995). Unless there is sufficient evidence for a jury to return a verdict in the nonmovant's favor, there is no genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-51, 106 S. Ct. 2505, 2511 (1986).

In order to determine whether or not summary judgment should be granted, an examination of the substantive law is essential.  Substantive law will identify which facts are material in that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Id.

With these principles in mind, the Court now turns to a review of the claims at issue.

### B.    Plaintiff Joanna Lester's Discrimination Claims under Title VII.

Because Ms. Lester has no direct evidence of discrimination, the standard applicable to this case follows the familiar burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Pratt v. City of Houston, Tex., 247 F.3d 601, 606 (5th Cir. 2001).  First, she must "establish a prima facie case of discrimination by a

preponderance of the evidence." <u>Id.</u>  Ms. Lester establishes a prima facie case by providing evidence "that she: (1) is a member of a protected class; (2) was qualified for her position; (3) was subject to an adverse employment action; and (4) . . . others similarly situated were treated more favorably." <u>Okoye v. University of Texas Houston Health Science Center</u>, 245 F.3d 507, 512-513 (5th Cir. 2001) (citations omitted).

Once Ms. Lester carries her burden of proving a prima facie case of discrimination, a "presumption of discrimination" arises and the burden then shifts to Defendant to "articulate a legitimate nondiscriminatory reason" for the employment decision. <u>Valdez v. San Antonio Chamber of Commerce</u>, 974 F.2d 592, 596 (5th Cir. 1992).  Defendant's reasons do not need to be credible; rather, the reasons need only be facially legitimate and nondiscriminatory.  <u>See</u> <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 508-509, 113 S.Ct. 2742, 2748-49 (1993).  Once Defendant has articulated a legitimate explanation of its decision, Ms. Lester must prove that the reason proffered is merely a pretext for discrimination. <u>See</u> <u>McDonnell Douglas Corp.</u>, 411 U.S. at 802, 93 S.Ct. at 1824; <u>Rhodes v. Guiberson Oil Tools</u>, 39 F.3d 537, 542 (5th Cir. 1994). To demonstrate a "pretext for discrimination," Ms. Lester must show both (1) that the employer's proffered reason was false and (2) that race, gender, or religious discrimination was the real reason for the employment decision.  <u>See</u> <u>Hicks</u>, 509 U.S. at 516-517, 113 S.Ct. at 2752;  <u>Patton v. United Parcel Service, Inc.</u>, 910 F.Supp. 1250, 1263 (S.D. Tex. 1995); <u>Rhodes v. Guiberson Oil Tools</u>, 39 F.3d at 542.  While a prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated, <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 149, 120 S. Ct. 2097, 2109 (2000), "[i]t is not

enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination."  Id., quoting Hicks, 509 U.S. at 508-509, 113 S.Ct. at 2748-49.

Ms. Lester has alleged discrimination based on race (black), sex (female), and religion (Baptist).  As all three of these classes are protected by Title VII, the analysis for each applies the familiar burden-shifting framework.  This Court finds that Ms. Lester has established the first two elements of her prima facie case – she is a member of a protected class and was qualified for her position.  Thus, the Court will focus on elements three and four – she was subject to an adverse employment action and others similarly situated were treated more favorably.  See Okoye, 245 F.3d at 512-513.  Further, the Court will also examine whether Ms. Lester has proven that Defendant's articulated legitimate explanation for its employment decisions was merely a pretext for discrimination.  The Court will begin by setting forth the law as to adverse employment actions, similarly situated comparators, and pretext.

To prevail on her discrimination claim, Ms. Lester must show that she suffered an adverse employment action because of her race, sex, or religion.  See Urbano v. Continental Airlines, Inc., 138 F.3d 204, 206 (5th Cir. 1998).  In the Fifth Circuit, "only ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensation are actionable adverse employment actions under Title VII."  Pryor v. Wolfe, No. 05-21067, 2006 WL 2460778, *2 (5th Cir. Aug. 22, 2006); see also Dollis v. Rubin, 77 F.3d 777, 781-782 (5th Cir. 1995) (stating "Title VII was designed to address ultimate employment decisions, not to address every decision made by employers that

arguably might have some tangential effect upon those ultimate decisions.").[3]

Moreover, in order to prove her discrimination claim, it is not enough for Ms. Lester to allege that another employee outside her protected class was treated more favorably than she was treated.  Instead, she must establish that an employee "similarly situated in all relevant respects" was treated more favorably than she was treated.  See Smith v. Monsanto Chemical Company, 770 F.2d 719, 723 (8th Cir. 1985) (citing Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 258, 101 S.Ct. 1089, 1096 (1981)).  In order for the Court to compare Ms. Lester with other employees, she would

---

[3]In this case, Ms. Lester focuses on alleged adverse employment actions relating to miscellaneous working conditions, including duty assignments, scheduling, and training opportunities.  Yet, in her complaint and in her opposition brief, she also makes stray allegations regarding harassment.  This Court must assume that Ms. Lester is attempting to assert a hostile work environment claim, which is not actionable discrimination unless the conduct complained of is severe or pervasive.  See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257 (1998).

Whether the work environment may be considered sufficiently hostile or abusive to support a claim for a hostile environment is to be measured by the totality of the circumstances, including the frequency and severity of the discriminatory conduct, whether such conduct is physically threatening or humiliating, and whether the conduct unreasonably interferes with the plaintiff's work performance.  See Harris v. Forklift Systems, Inc., 510 U.S. 17, 23, 114 S.Ct. 367, 371 (1993).  In order to meet her burden, Ms. Lester must show more than a few isolated incidents of racial, sexual, or religious enmity.  See Snell v. Suffolk County, 782 F.2d 1094, 1103 (2nd Cir.1986).  "There must be a steady barrage of opprobrious racial[, sexual, or religious] comments."  Schwapp v. Town of Avon, 118 F.3d 106, 110 (2nd Cir. 1997).  A hostile work environment can only be found when the workplace is "permeated" by the offensive conduct.  See id.  As the Fifth Circuit has noted: "claims of non-severe non-pervasive harassment are excluded from Title VII."  Indest v. Freeman Decorating, Inc., 164 F.3d 258 (5th Cir. 1999).

Here, Ms. Lester simply has not reached the baseline necessary to survive summary judgment.  She has not alleged specific comments and conduct in support of a purported hostile work environment claim and the record evidence does not support a finding of a workplace permeated by offensive conduct based on race, sex, or religion.  Accordingly, Ms. Lester's allegations are insufficient as a matter of law to show that any complained of conduct or comments were based on race, sex, or religion and/or to create a racially, sexual, or religious hostile environment.

have to show that she was similarly situated to those other employees in terms of performance, qualifications, and conduct without such differentiating or mitigating circumstances that would distinguish their situations.  See Smith v. Stratus Computer, Inc., 40 F.3d 11, 17 (1st Cir. 1994) (citing Mitchell v. Toledo Hospital, 964 F.2d 577, 583 (6th  Cir. 1992).  Further, the individuals with whom Ms. Lester seeks to compare her treatment must have dealt with the same supervisor and have been subject to the same standards.  See Mitchell, 964 F.2d at 583 (citations omitted).

Even assuming Ms. Lester can establish a prima facie claim of discrimination, she must also show that Defendant's legitimate, non-discriminatory reasons for its employment actions were false, or were a pretext for discrimination.  She cannot survive summary judgment merely creating a factual issue as to whether Defendant's decisions were wrong or mistaken as the issue in a Title VII case is whether Defendant acted with discriminatory animus.  See Abramson v. William Paterson College of New Jersey, 260 F.3d 265 (3rd Cir. 2001).  Ms. Lester must prove that Defendant's reasons for its employment decisions were pretext, "a dishonest explanation, a lie rather than an oddity or an error."  Kulumani v. Blue Cross Blue Shield Ass'n., 224 F.3d 681, 685 (7th Cir. 2000).

Ms. Lester must prove not only that the reasons given by Defendant for its decisions relating to miscellaneous working conditions, including duty assignments, scheduling, and training opportunities were false, but that the real reason for the decision was discrimination.  See Hicks, 509 U.S. at 516-517, 113 S.Ct. at 2752.  While her prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully

discriminated, <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 149, 120 S. Ct. 2097, 2109, (2000), "[i]t is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." <u>Id.</u>, <u>quoting</u> <u>Hicks</u>, 509 U.S. at 508-509, 113 S.Ct. at 2748-49.  Further, subjective beliefs, whether or not they are genuine, that Defendant harbored discriminatory animus cannot be the basis of judicial relief.  <u>See</u> <u>Elliot v. Group Medical & Surgical Service</u>, Inc., 714 F.2d 556, 567 (5th Cir. 1983).  To establish pretext, Ms. Lester cannot merely rely on her subjective belief that discrimination has occurred; rather, she has the ultimate burden of persuasion in proving intentional discrimination throughout the case.  <u>See</u> <u>Price v. Marathon Cheese Corp.</u>, 119 F.3d 330 (5th Cir. 1997).

With these legal standards in mind, the Court will now proceed to an examination of each of Ms. Lester's specific discrimination claims.

### 1.    April 7, 2003 to May 10, 2003 Rotation Between Surgery and X-Ray.

Ms. Lester alleges that from April 7, 2003 to May 10, 2003, she was forced to perform double duty in surgery and portables in the x-ray department.  She contends that "the other techs did only portable x-ray or other x-ray duties, but not both the same day as [she] was required to do."  Document 15-1 at 3.  She maintains that her "double duty" was "part of the on-going pattern of harassment and discrimination that was started by Moore in January 2003 and continued."  <u>Id.</u> at 4.

Conversely, Defendant contends that technicians such as Ms. Lester routinely rotated through each department, including surgery, to maintain their skills with all of the equipment.  <u>See</u> Record Document 11, Exhibit 1 at 266-267.  Defendant acknowledged

that employees in the Ultrasound Department had not been rotating for a period of time due to the fact that there were only two employees.  See id.  However, when a third employee was hired, the technicians began to rotate again.  See id.  Specifically, Moore stated:

> And so in January of 2003, however, we went – I think at that time the two techs on – Jamie Nordan and JoAnna Lester – as well as Ann Ross . . . .  And so we had two pieces of equipment and three people . . . .  And so we started initiating them going through radiology as well because there was really nothing for the third person to do with only two pieces of equipment.
> And so they started rotating the same way because it was in their PD – Ann Ross' and Ms. Lester['s] – that they would do diagnostic procedures. And so they started rotating through diagnostic. . . .
> That's why there are individual rotations so that everybody gets a fair turn through there and nobody forgets how to do a specialty procedure. . . .
> It was a just a rotation.  The same rotation that all my CT techs and the other ultrasound lady that has the same PD, which was Ann Ross.

Id., 266-270.

The Court agrees with Defendant and finds that the assignment to work on the portable x-ray was not an additional, or double, job duty.  See Record Document 11, Exhibit at 269-270.  Thus, at the outset, the Court does not believe that Ms. Lester's rotation between surgery and x-ray was an ultimate employment decision such as hiring, granting leave, discharging, promoting, and compensation.  See Pryor, 2006 WL 2460778, *2.  The rotation was not a decision about benefits, compensation or employment and Ms. Lester has not shown how her rotation related to an ultimate employment decision.  Further, Moore's deposition testimony bears on the issue of whether others similarly situated were treated more favorably than Ms. Lester.  Ms. Lester and Ms. Ross held position description #04307A, while Ms. Nordan held position

description #052000.  See Record Document 11, Exhibit 1 at 380-381.  Performing x-rays and diagnostic procedures was required under position description #04307A.  See id., Exhibit 1 at 383.  There is simply no evidence that another similarly situated technician – a technician holding position description #04307A such as Ms. Ross – was not required to perform a rotation.

Alternatively, even if the Court assumes that Ms. Lester has a prima facie case of discrimination, she has come forward with no evidence that Moore's lengthy description of the rotation process, wherein the technicians in position description #04307A rotated between ultrasound and diagnostic (x-ray), was pretext.  She has no evidence, other than her subjective beliefs, that such reason was false or that the real reason for the decision for her rotation was discrimination.  Accordingly, her Title VII discrimination claim relating to her April 7, 2003 to May 10, 2003 rotation between surgery and x-ray fails and summary judgment is granted.

### 2.    Placement on the Emergency Coverage/Call-Back Roster to Perform General Diagnostic Work (Weekends/Holidays).

Ms. Lester contends that she was unfairly placed on the emergency coverage/call-back roster for general diagnostic work and that such action was discriminatory because her white co-worker, Ms. Nordan, was never been placed on the emergency call-back roster.  Defendant described its emergency coverage/call-back system in great detail, explaining that no technicians are assigned to work weekends or holidays. See id., Exhibit 1 at 270-271.  Rather, a schedule is passed among the technicians and they can sign up to cover weekends and holidays on a voluntary basis. See id., Exhibit 1 at 271.  If a shift is not covered after this voluntary process, then the supervisor assigns technicians

according to the emergency coverage/call-back roster.  <u>See id.</u>, Exhibit 1 at 271-272.

The roster lists all AART certified technicians alphabetically and once an employee is

assigned and works an emergency shift, the technician's name is crossed off and the next

technician on list is assigned the emergency coverage.  <u>See id.</u>, Exhibit 1 at 272.  If a

technician is assigned a shift, he or she is free to switch that shift with another technician.

Defendant has come forward with the emergency coverage/call-back calendars

which evidence that all AART certified technicians were subject to assignment using the

emergency on-call system.  Further, Moore specifically described in his deposition the

events leading up to Ms. Lester's July 2003 assignment to the emergency coverage/call-

back roster, specifically noting that Ms. Lester did not work July 5 or 6.  <u>See id.</u>, Exhibit

1 at 273-274.  Because Ms. Lester did not work on July 5 or 6, her name remained on the

top of the emergency coverage/call-back roster and she was called into work on July 17,

2003.  <u>See id.</u>, Exhibit 1 at 274.  After working July 17, Ms. Lester's name came off the

top of the roster.  <u>See id.</u>, Exhibit 1 at 275.

Here, this Court will assume that placement on the emergency coverage/call-back

roster to perform general diagnostic work amounts to an adverse employment decision

and, instead, focus on whether others similarly situated were treated more favorably than

Ms. Lester.  Defendant has presented sufficient evidence to demonstrate that all AART

certified technicians were placed on the emergency coverage/call-back roster.  Ms. Lester

seems to focus on the fact that Ms. Nordan, a white employee, was never placed on the

emergency coverage/call-back roster; yet, the record evidence shows that Ms. Nordan

was not AART certified.  Thus, Ms. Nordan is not a proper comparator because her

qualifications differentiate her from Ms. Lester.  <u>See Smith</u>, 40 F.3d at 17.  Accordingly,

her Title VII discrimination claim relating to her placement on the emergency coverage/call-back roster fails and summary judgment is granted.[4]

### 3.    On-Call Scheduling Responsibilities.

Ms. Lester alleges that in June 2003, her income was decreased because job duties that she had been performing for three and one-half years – making the on-call schedule – were taken away without reason or justification by Moore.  Defendant again defends this claim by detailing the on-call scheduling process.  See Record Document 11, Exhibit 1 at 276-280.  The on-call schedule, as compared to the emergency coverage/call-back roster, delineates which technician is to be called after regular business hours in the event a procedure needs to be performed and no technician on duty can perform it.  There are two separate on-call schedules in radiology, one for Ultrasound and one for Computerized Tomography ("CT").  See id., Exhibit 1 at 276.  Prior to June 2003, the technicians in Ultrasound and CT were permitted to make their own on-call schedules. See id., Exhibit 1 at 276-277.  Moore stated that Ms. Lester "was never performing any duties as far as [he] knew" regarding the on-call scheduling and that "no one person was assigned to do that [the on-call scheduling] because . . . they work it out amongst themselves."  Id., Exhibit 1 at 276.

Yet, in June 2003, the on-call schedules were not completed on time and Moore

---

[4]The Court again notes that even if it assumes that Ms. Lester has a prima facie case of discrimination, she has come forward with no competent summary judgment evidence indicating that Moore's lengthy description of not only the emergency call-back process, but also the way in which Ms. Lester was placed on the roster for July 2003, was pretext.  She has no evidence, other than her subjective beliefs, that the process of his actions of placing her on the roster in July 2003 were false or that the process or his decisions were based on intentional discrimination.

made the decision to take over the scheduling beginning in July 2003.  See id., Exhibit 1 at 277.  He made the on-call schedule on a rotating basis and the technicians were free to exchange on-call days.  See id., Exhibit 1 at 277-279.  The three week pattern for on-call scheduling in Ultrasound was Ms. Lester, Ms. Ross, Ms. Nordan.  See id., Exhibit 1 at 278.

After reviewing the record evidence, the Court finds that if Ms. Lester had been arranging the monthly Ultrasound on-call schedule prior to June 2003, it was due to an informal arrangement amongst the employees and not attributable to a job duty assigned by Defendant.  Even after Moore took over the on-call scheduling, Ms. Lester cannot show how others similarly situated were treated more favorably than her, as all the employees in both the Ultrasound and CT departments were required to perform on-call duty and all employees were placed on the same rotating on-call schedule.  Simply put, Ms. Lester was treated the same as all other radiology employees; thus, she has no prima facie case of discrimination.

Notwithstanding, even if Ms. Lester could prove a prima facie case of discrimination, her Title VII claim fails because she cannot prove pretext.  Moore articulated a legitimate nondiscriminatory reason for taking over the on-call scheduling, i.e., the employees has not completed the on-call schedule on time.  His reason is facially legitimate and nondiscriminatory.  See St. Mary's Honor Center, 509 U.S. at 508-509, 113 S.Ct. at 2748-49.  To rebut this legitimate explanation, Ms. Lester must prove that the reason proffered is merely a pretext for discrimination.  See McDonnell Douglas Corp., 411 U.S. at 802, 93 S.Ct. at 1824; Rhodes, 39 F.3d at 542.

Ms. Lester alleges that "the schedule for Ultrasound was completed on time and

submitted through the proper channels as usual" and that "Moore . . . is lying and making up an excuse to justify his discriminatory actions."  Record Document 15-1 at 6.  Ms. Lester seems to be arguing that pretext should be inferred because "Moore could not remember who the operator was or the exact process for being informed of the alleged problem or any thing specific."  Id. at 6. Ms. Lester also notes that  "Defendant has presented no evidence that the telephone operator had complained or was having any problem knowing who was on call."  Id. at 6.  Yet, Ms. Lester has nothing more than the aforementioned conclusory, subjective beliefs that there was pretext for discrimination. She has not shown that Moore's proffered reason was false or that race, gender, or religious discrimination was the real reason for his taking over the on-call scheduling. Accordingly, her Title VII claims relating to on-call scheduling fail and summary judgment is granted.

### 4.    Holiday Work Schedule.

The Court agrees with Defendant's succinct assessment of Ms. Lester's claims as to July 4, 2003 and September 3, 2003.  The record establishes that Ms. Lester did not work on July 4, 2003 and that September 5, 2003[5] was not a holiday.  This finding is supported by Ms. Lester's deposition, wherein she seemed to focus solely on May 26, 2003 and did not give specific details regarding July 4 and September 3.  See Record Document 11, Exhibit 1 at 196-198.

On May 26, 2003 (Memorial Day), Ms. Lester was scheduled to work through the

---

[5]The closest federal holiday was Labor Day, which fell on Monday, September 1, 2003.

emergency coverage/call-back roster for weekends and holidays.[6]   The Court has reviewed the record evidence and finds that the exhibits clearly evince that Moore assigned Ms. Lester to work on May 25, 2003 from 12:00 a.m. to 8: 00 a.m. according to the alphabetical emergency coverage/call-back roster. See Record Document 11, Exhibit 1 at 647.  Then, shifts were traded amongst employees after Moore's posting and Ms. Lester was moved to May 26, 2003 from 8:00 a.m. to 4:00 p.m.  See id.  Based on this occurrence, Ms. Lester cannot demonstrate that Defendant, namely Moore, had any discriminatory animus when assigning her to work on May 25, 2003, which was not a federal holiday.  Further, all AART certified technicians were placed on the emergency coverage/call-back roster and Ms. Lester simply cannot demonstrate that others similarly situated were treated more favorably than her.[7]  Accordingly, Ms. Lester's Title VII claims relating to holiday work schedules fail and summary judgment is granted.

### 5.    July 6, 2003 Work Schedule and Leave Request.

Ms. Lester alleges that she was discriminated against on July 6, 2003 when she was scheduled to work via the emergency coverage/call-back roster although her supervisor knew in advance that she was going on a trip with the Girl Scouts.  Ms. Lester relies on the fact that she presented, on December 10, 2002, a written leave request for July 7-11, 2003.  See Record Document 15-1 at 9.  Ms. Lester also contends that she gave the same written leave request to Moore on December 10, 2002.  See id.  Further,

---

[6]See supra, Section II(b)(2) of the instant Memorandum Ruling.

[7]Ms. Lester again contends that Defendant acted with discriminatory animus when Ms. Nordan, a white employee, was not placed on the emergency coverage/call-back roster.  Yet, as previously held by this Court, Ms. Nordan is not a proper comparator due to her lack of AART certification.

Ms. Lester contends that her proper work assignment according to the emergency coverage/call-back roster was July 6 from 12:00 a.m. to 8:00 a.m., not July 6 from 4:00 p.m. to 12:00 a.m.  See id. at 10.  Ms. Lester argues that she requested her leave far enough in advance for July 6, 2003; therefore, she should not have been eligible for placement using the emergency coverage/call-back roster for this time period.

Defendant once again defends the claim by detailing the Veteran Administration's ("VA") leave program.  All leave is **properly** requested and approved through the VA's VISTA computer system, **not** written leave requests.  See Record Document 11, Exhibit 6 (Declaration, ¶ 3).  Ms. Lester's VISTA records indicate that on July 1, 2003, at 8:09 a.m., she properly requested LWOP for July 7-11, 2003.  See id., Exhibit 6 at 11.  The request was approved on July 28, 2003.  See id.  By the time Ms. Lester requested LWOP on July 1, 2003, Moore had already completed the emergency coverage/call-back roster for July 2003, which assigned Ms. Lester to work on July 6, 2003.

The Court has reviewed Ms. Lester's VISTA records and agrees that by the time she requested LWOP on July 1, 2003, the emergency coverage/call-back roster was already completed and Ms. Lester had been assigned to work July 6, 2003.  Because Ms. Lester's July 6, 2003 shift was assigned prior to her July 1, 2003 LWOP request, this Court cannot infer that Defendant had a discriminatory animus toward Ms. Lester when it properly followed the emergency coverage/call-back roster assignment procedure as stated in Section II(B)(2) of the instant Memorandum Ruling.  More importantly, Ms. Lester never requested leave, via VISTA or an improper written request, for July 6, 2003.  Simply put, she was subject to being scheduled to work via the emergency coverage/call-back roster and her Title VII claim relating to her July 6, 2003 work schedule and leave request

Page 19 of  26

fails and summary judgment is granted.[8]

### 6.    August 8, 2003 On-Call Schedule and Leave Request.

Ms. Lester alleges that she was discriminated against on August 8, 2003 when her supervisors scheduled her to be on call although he knew months earlier that she had requested vacation from August 4-8, 2003.  According to Ms. Lester's VISTA records, she requested leave for August 4-8, 2003 multiple times.  The first request is sequence #338369, last amended by Ms. Lester on April 14, 2003.  See Record Document 11, Exhibit 6 at AE-15.  The request was reviewed by Moore, but could not be approved on April 21, 2003 because Ms. Lester had a negative leave balance.  See id.  The second request was sequence #365417, last amended by Ms. Lester on July 17, 2003.  See id., Exhibit 6 at 12.  Moore approved this request on July 28, 2003.  See id.  The leave request pertained to normal business hours, thus her leave ended at 4:30 p.m. on August 8, 2003.

The record evidence indicates that the July, August, and September 2003 on-call schedule was completed by Moore prior to July 1, 2003.  See id., Exhibit 1 at 286.  Thus, when Ms. Lester requested leave on July 17, 2003, she was already scheduled to work an on-call shift (after regular business hours) on August 8, 2003.  See id., Exhibit 1 at 625. Again, as explained in Section II(B)(3) of this Memorandum Ruling, Ms. Lester was free to switch shifts with any other technician.

Here, even if the Court assumes Ms. Lester has demonstrated a prima facie case of discrimination, her Title VII claim relating to August 8, 2003 fails because she cannot

---

[8]The Court also notes that the record evidence indicates that Ms. Lester did not work on July 6, 2003.  See Record Document 11, Exhibit 1 at 273-274.

show pretext.  Moore stated a legitimate, nondiscriminatory reason for scheduling Ms. Lester for August 8, i.e., he had already assigned Ms. Lester to work the on-call shift for August 8 prior to her July 17, 2003 leave request.  This reason is legitimate and nondiscriminatory on its face.  Ms. Lester challenges the legitimate reason by arguing that she did not have a negative leave balance at the time she made her first leave request. See Record Document 15-1 at 10.  Ms. Lester further argues that even if she had a negative leave balance, Moore's failure to act on her leave request for 4 months was unreasonable.  See id. at 10-11.

The Court finds that Ms. Lester has not shown that Defendant's legitimate, non-discriminatory reasons for scheduling her to work on August 8, 2003 was false, or was a pretext for discrimination.  Her conclusory allegations and unsubstantiated assertions regarding her belief that she did not have a negative leave balance is simply insufficient to prove that Defendant's reasons for its employment decision was a dishonest explanation and/or that the real reason for Defendant's reason to schedule her to work on August 8, 2003 was discrimination.  Accordingly, her Title VII claim relating to her August 8, 2003 work schedule and leave request fails and summary judgment is granted.

### 7.    Cross-Training.

Ms. Lester contends that Defendant discriminated against her by allowing Greg Endel, a white male, to cross-train in bone densitometry while refusing to allow her to do so.  She stated that she made two separate requests to be cross-trained and was rejected twice, despite the fact that she had some previous training in densitometry.  See Record Document 15-1 at 13.  Conversely, Defendant maintains that Greg Endel was not cross-training, but rather working in the bone densitometry clinic on an emergency basis.  See

Record Document 11, Exhibit 1 at 292-294.  Supervisor Moore further stated that Ms. Lester did not request to cross-train until mediation proceedings and that Greg Endel was selected to cover the backlog because he had a particular kind of pay status where his pay could be affected if he did not "work so much time on call for CT."  Id., Exhibit 1 at 292-293.[9]

Even if this Court assumes that Ms. Lester requested and was denied an opportunity to cross-train and that Greg Endel was permitted to cross-train, her Title VII claim fails because "denial of training is not an ultimate employment decision."  Grother v. Union Pacific R. Co., No. H-04-3279, 2006 WL 1662936, *13 (S.D.Tex. June 9, 2006), citing Dollis v. Rubin, 77 F.3d 777, 782 (5th Cir.1995).  Fifth Circuit jurisprudence clearly holds that "Title VII was designed to address ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions" and that "ultimate employment decisions include acts such as hiring, granting leave, discharging, promoting, and compensating."  Dollis, 77 F.3d at 781-82.  In Hamilton v. Texas Dep't. of Transp., No. 03-20362, 2004 WL 34811, **2 (5th Cir. Jan. 6, 2004), the Fifth Circuit cited Dollis for the principle that an employer's refusal to provide an employee with training opportunities, thereby decreasing future promotion opportunities, was not ultimate employment decision.

Here, Ms. Lester does not allege that Defendant's decision to deny her request for cross-training was a decision about benefits, compensation or employment.  She merely

---

[9]The Court also notes that Ms. Lester has come forward with no evidence to prove that Moore's reason for permitting Greg Endel to work in bone densitometry was pretext. She has no evidence, other than her subjective beliefs, that such reason was false or that the real reason for the decision was discrimination.

claims that the decision was "yet another example of the ongoing campaign of harassment and discrimination."  Record Document 15-1 at 13.  Thus, Ms. Lester has failed to show how a denial of cross-training relates to an ultimate employment decision and, consequently, her Title VII discrimination claim relating to cross-training fails and summary judgment is granted.

### C.   Plaintiff Joanna Lester's Pendent State Law Claims.

In addition to her Title VII claims, Ms. Lester also made claims under Louisiana law for intentional and negligent infliction of emotional distress.  See Record Document 1, § 4.  Defendant's Memorandum in Support of its Motion for Summary does not mention Ms. Lester's intentional and negligent infliction of emotional distress claims.  Yet, Defendant's Motion for Summary Judgment seeks dismissal of this matter "in its entirety."  Record Document 11-2 at 21.  Therefore, the Court will consider the merits of Ms. Lester's intentional and negligent infliction of emotional distress claims.

Louisiana does not recognize an independent tort of negligent infliction of emotional distress.  See Doe v. Smith, 2005-0653 (La.App. 4 Cir. July 13, 2005), 913 So.2d 140, 142, citing Moresi v. State through Dept. of Wildlife and Fisheries, 567 So.2d 1081, 1096 (La. 1990).  Yet, a plaintiff may recover for unintentional or negligent infliction of emotional distress unaccompanied by physical injury where the defendant's negligent conduct is deemed to be outrageous.  See id.  "In order to recover, the plaintiff must show the existence of an 'especial likelihood of genuine and serious mental distress, arising from the special circumstances, which serves as a guarantee that the claim is not spurious.'" Id.

In order to state a claim for intentional infliction of emotional distress under Civil

Code article 2315, the Louisiana Supreme Court has held that a plaintiff must establish (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from the conduct.  See White v. Monsanto Company Co., 585 So.2d 1205, 1209 (La. 1991).  The Louisiana Supreme Court has held:

> The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.  Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.  Persons must necessarily be expected to be hardened to a certain amount of rough language, to occasional acts that are definitely inconsiderate and unkind.

Id., 585 So.2d at 1209.

The Fifth Circuit has consistently held that "ordinary employment disputes" do not give rise to an intentional infliction claim.  Deus v. Allstate, 15 F.3d 506, 515 (5th Cir.), cert. denied, 513 U.S. 1014, 115 S.Ct. 573 (1994).  Article 2315 of the Louisiana Civil Code, the source of an action for intentional infliction of emotional distress in Louisiana, simply does not provide a cause of action for employment discrimination.  See Simoneaux v. New York Life Insurance Co., No. CIV.A. 00-755-B-M3, 2001 WL 667738 (M.D. La. April 25, 2001) (citation omitted); Glock v. Casino America, Inc., 20 F.Supp. 2d 991 (W.D. La. 1998); Hornsby v. Enterprise Transportation Co., 987 F.Supp. 512, 515 (M.D. La. 1997); Caletka v. State Farm Mutual Automobile Insurance Co., 936 F.Supp. 380 (W.D. La. 1996); Baynard v. Guardian Life Insurance Co., 399 So.2d 1200 (La. App. 1 Cir. 1981); Nicholas v. Allstate Ins. Co., 765 So.2d 1017 (La. 2001).

Here, the record is clear that Ms. Lester simply has not alleged conduct which is

extreme and outrageous as a matter of law.  She has not demonstrated negligent conduct on the part of Defendant that could be deemed outrageous and she has not shown circumstances to persuade this Court that her negligent infliction of emotional distress claim is not spurious.  Likewise, her intentional infliction of emotional distress claim fails because she has not shown that the conduct of Defendant was extreme and outrageous. See White, 585 So.2d at 1209.  There is no record evidence indicating conduct on the part of Defendant that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.[10]  See id.  The law is well settled that liability for an intentional infliction of emotional distress claim does not extend to mere insults, indignities, and other trivialities.  See id.  Accordingly, the Motion for Summary Judgment as to Ms. Lester's state law claims of negligent and intentional infliction of emotional distress is granted.

### D.    Plaintiff Darien Lester's Claims.

In the complaint, Plaintiffs allege that "Defendant is liable to Complainant Darien D. Lester for loss of consortium, loss of love and affection, intentional infliction of emotional distress, negligent infliction of emotional distress and mental anguish."  Record Document 1, ¶ 7.  As to Mr. Lester's loss of consortium claim, the Court notes that "no cause of action for loss of consortium is available under Title VII."  Chelette v. State Farm Mut. Auto. Ins. Co., No. CIVA 04-2440, 2006 WL 2513918, at *17 (W.D. La. Aug. 29, 2006), citing Edsall v. Assumption Coll., 367 F.Supp.2d 72, 85 (D.Mass.2005) (injured

---

[10]See supra note 3.

Page 25 of  26

party's spouse cannot assert loss of consortium under 42 U.S.C. § 1981 or Title VII).

Accordingly, the Motion for Summary Judgment is granted as to Mr. Lester's loss of

consortium claim.   Likewise, for the reasons stated in Section II(D) of the instant

Memorandum Ruling, which pertains to Ms. Lester's claims of negligent and intentional

infliction of emotional distress, summary judgment is also granted as to Mr. Lester's

intentional and negligent infliction of emotional distress claims.

## III.    CONCLUSION.

Based on the foregoing analysis, Defendant's Motion for Summary Judgment is

**GRANTED**.  A judgment consistent with the terms of the instant Memorandum Ruling shall

issue herewith.

**THUS DONE AND SIGNED** at Shreveport, Louisiana, this 7th day of March, 2007.

S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE